**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**WANDA GILCHRIST,**

     **Plaintiff,**

**vs.**                        **Case No.  4:13-cv-174-CAS**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

     **Defendant.**

_____/

**MEMORANDUM OPINION AND ORDER**

This is a Social Security case referred to the undersigned United States

Magistrate Judge upon consent of the parties and reference by United States District

Judge Robert L. Hinkle.  Doc. 11.  *See* Fed. R. Civ. P. 73; 28 U.S.C. § 636(c).  After

careful consideration of the entire Record, the Court reverses the decision of the

Commissioner and remands the case for further consideration.[1]

## I.  Procedural History of the Case

On May 4, 2009, Plaintiff, Wanda Gilchrist, filed a Title II application for a period

of disability and Disability Insurance Benefits (DIB) and a Title XVI application for

Supplemental Security Income (SIS) alleging disability beginning March 1, 2007.

R. 20.  (Citations to the Record shall be by the symbol "R." followed by a page number

that appears in the lower right corner.)  Plaintiff's date last insured, or the date by which

---

[1]  Having considered this case on the merits, Plaintiff's motion for summary
judgment, doc. 15, is denied.

his disability must have commenced in order to receive DIB under Title II, is March 31, 2010. R. 20.

Plaintiff's applications were denied initially on September 28, 2009, and upon reconsideration on April 1, 2010. *Id.* On May 27, 2010, Plaintiff requested a hearing. *Id.* On May 11, 2011, in Tallahassee, Florida, Plaintiff appeared and testified at a hearing conducted by Administrative Law Judge (ALJ) Michael J. Amendola. R. 20, 32, 43-63, 65-66. Ron C. Mayne, an impartial vocational expert, testified during the hearing. R. 63-65, 138-39 (Resume). During the hearing, Plaintiff amended her alleged onset date to November 8, 2009, the date of Plaintiff's slip and fall. R. 66, 231. Plaintiff was represented by Liz Montefu, a non-attorney representative, who submitted a pre-hearing brief on May 6, 2011. R. 20, 108, 231-37.

On June 3, 2011, the ALJ issued a decision and denied Plaintiff's applications for benefits concluding that Plaintiff was not disabled from November 8, 2009, through the of the ALJ's decision. R. 32. Plaintiff requested review of this decision and filed a brief on March 22, 2012, R. 244-47, which the Appeals Council denied on February 7, 2013. R. 1-5. The ALJ's decision stands as the final decision of the Commissioner.

On April 3, 2013, Plaintiff, by and through present counsel, filed a complaint with the United States District Court seeking review of the ALJ's decision. Doc. 1. Plaintiff filed a motion for summary judgment and memorandum, docs. 15 and 16, and Defendant filed a memorandum, doc.18, which have been considered.

## II. Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1. "The claimant meets the insured status requirements of the Social Security Act through March 31, 2010." R. 22.

2. "The claimant has not engaged in substantial gainful activity since November 8, 2009, the amended alleged onset date." *Id.*

3. "The claimant has the following severe impairment: borderline intellectual functioning." *Id.* The ALJ found that Plaintiff's "history of cervical degenerative joint disease and lumbar radiculopathy" are "non-severe because they do not significantly limit the claimant's ability to perform basic work activities, are well-controlled with medication, and/or are episodic in nature." R. 23.

4. "The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 23. The ALJ considered whether Plaintiff met or equaled the requirements of Listing 12.05A-D, and relevant here, Listing 12.05C. R. 23-26.

5. "[T]he claimant has the residual functional capacity [RFC] to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she is limited to remembering one or two-step instructions and her work must be at the lowest Specific Vocational Preparation Level (SVP)." R. 27.

6. "The claimant is unable to perform any past relevant work" as a residential care assistant or cashier, retail, both with an SVP of 3, and medium and light exertional levels, respectively. R. 30.

7. The claimant was born on November 5, 1984, and was 25 years old, which is defined as a younger individual, age 18-49, on the amended alleged onset date. The claimant received a high school diploma and is able to communicate in English. R. 31.

8. "Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform" such as common area cleaner, assembler, light products, and clothing sorter, all with an SVP of 2 and light exertional level. R. 31-32.

9. Plaintiff "has not been under a disability, as defined in the Social Security Act, from November 8, 2009, through the date of this decision." R. 32.

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.

42 U.S.C. § 405(g); <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial

evidence is more than a scintilla, but less than a preponderance. It is such relevant

evidence as a reasonable person would accept as adequate to support a conclusion."

<u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); <u>accord</u>

<u>Moore v. Barnhart</u>, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual

findings are conclusive if supported by substantial evidence." <u>Wilson v. Barnhart</u>, 284

F.3d 1219, 1221 (11th Cir. 2002) (citations omitted). The court may not reweigh the

evidence or substitute its own judgment for that of the ALJ even if it finds that the

evidence preponderates against the ALJ's decision. <u>Moore</u>, 405 F.3d at 1211.[2]

"In making an initial determination of disability, the examiner must consider four

factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining

physicians; (3) subjective evidence of pain and disability as testified to by the claimant

and corroborated by [other observers, including family members], and (4) the claimant's

age, education, and work history.'" <u>Bloodsworth</u>, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do past relevant work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work

---

[2] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. §§ 404.1509, 416.909 (duration

requirement). Both the "impairment" and the "inability" must be expected to last not less

than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002). In addition, an individual is

entitled to DIB if she is under a disability prior to the expiration of her insured status.

*See* 42 U.S.C. § 423(a)(1)(A) and (d); Torres v. Sec'y of Health & Human Servs., 845

F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs.,

818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps. 20 C.F.R. §§

404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v).

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4. Does the individual have any impairments which prevent past relevant work?

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits. A positive finding at step three results in approval of the

application for benefits. At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work. Consideration

is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled. If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience. Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. §§ 404.1520(a)(4)(v), (e) & (g), 416. 920(a)(4)(v), (e) & (g). If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

Plaintiff bears the burden of proving that she is disabled, and consequently, is responsible for producing evidence in support of his claim. *See* 20 C.F.R. §§ 404.1512(a); 416.912(a); Moore v. Barnhart, 405 F.3d at 1211. On the other hand, an ALJ has a clear duty to fully and fairly develop the administrative record. Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995); 20 C.F.R. §§ 404.1512(d), 416.912(d). The question here is whether there are "the kinds of gaps in the evidence necessary to demonstrate prejudice" to Plaintiff. Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997).

## IV. Legal Analysis

### A. Issues

Plaintiff argues the ALJ erred when he did not find Plaintiff's Weschler Intelligence Scale for Children-Revised (WISC-R) score(s) in the 60s, coupled with

proven deficits in adaptive functioning and a severe impairment of borderline intellectual functioning, met or equaled the requirements of Listing 12.05C and would have justified a finding of disability. Doc. 16 at 4-13. Plaintiff also argues that the ALJ erred by determining her RFC without adequate consideration of her "additional and significant work-related limitation of function." Doc. 16 at 13-14. In the alternative, Plaintiff argues that the ALJ erred when he did not order a consultative examination, including intelligence testing, "if he had any doubt as to the validity of the IQ scores." As a result, the ALJ did not properly develop the record. Doc. 16 at 15-19.

The Commissioner responds that Plaintiff did not have deficits in adaptive functioning based on the ALJ's findings and the ALJ articulated his rationale for this result; the ALJ was not required to order a consultative examination; and the ALJ did not err in finding that Plaintiff did not have an impairment imposing additional and significant work-related limitation of function. Doc. 18 at 7-17.

**B. Whether the ALJ erred in determining that Plaintiff was not disabled.**

**1. Introduction**

Plaintiff's arguments center on whether the ALJ erred in not finding that her mental impairment met or equaled the criteria of Listing 12.05C.

The claimant has the burden of proving that her impairment(s) meet or equal a listed impairment by presentation of specific evidence of medical signs, symptoms, or laboratory test results meeting all of the specified medical criteria. Sullivan v. Zebley, 493 U.S. 521, 530 (1990). "For a claimant to show that [her] impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id*.

Listing 12.05C provides in relevant part:

12.05 Mental retardation:  Mental retardation refers to significantly subaverage general intelligence functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before the age of 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

* * * *

C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R., Pt. 404, Subpt. P, App. 1, Listing 12.05C.

Generally, the claimant meets the criteria for presumptive disability under section 12.05C when the claimant presents a valid IQ score of 60 through 70 inclusive, and when the claimant presents evidence of an additional mental or physical impairment significantly affecting claimant's ability to work.  *See* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir.1992) (a valid IQ score need not be conclusive of mental retardation, where IQ score is inconsistent with other evidence in record concerning claimant's daily activities and behavior).  Crayton v. Callahan, 120 F.3d1217, 1219-20 (11th Cir. 1997). "An ALJ should consider whether the results of an I.Q. test are consistent with the other medical evidence and the claimant's daily activities and behavior."  Henry v. Barnhart, 156 F. App'x 171, 173 (11th Cir. 2005) (citing Popp v. Heckler, 779 F.2d 1497 (11th Cir. 1986)).

In Hodges v. Barnhart, 276 F.3d 1265 (11th Cir. 2001), a case cited by Plaintiff, doc. 16 at 7, and Defendant, doc. 18 at 10, the court found that there was a presumption of deficits in adaptive functioning *prior* to age 22 if the claimant had a valid

IQ score between 60 and 70, as here. *Id*. at 1268-69 ("absent evidence of sudden trauma that can cause retardation, the IQ tests create a rebuttable presumption of fairly constant IQ throughout [the claimant's] life"). The court cautioned, however, that this presumption did not shift the burden of proof from the claimant to prove entitlement to benefits. *Id*. at 1269. Moreover, the court explained that this presumption is rebuttable and the Commissioner may present evidence of the claimant's daily activities to rebut the presumption of mental retardation. *Id*. As noted below, the Commissioner is not required to find mental retardation based on IQ scores alone. In Hodges, there was no evidence rebutting the presumption that the plaintiff had mental retardation with deficits in adaptive functioning. 276 F.3d at 1268. The record was devoid of evidence related to Plaintiff's mental condition before age 22 and the record indicated that the plaintiff could barely read from books and needed her daughter's assistance to write letters. *Id*. The court remanded for the purpose of examining plaintiff's activities of daily living to see if those activities rebutted the presumption of mental impairment. *Id*. at 1269.

Consistent with Hodges, "[i]f a claimant has been able to adapt in functioning after age 22, it is permissible to find that Listing 12.05C has not been met." Monroe v. Astrue, 726 F. Supp. 2d 1349, 1355 (N.D. Fla. 2010). The court in Monroe explains:

> In an unpublished case, the Eleventh Circuit has recast the rule of *Popp*: to meet Listing 12.05(C), "a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have [current] deficits in adaptive functioning; and (3) have manifested deficits in adaptive behavior before age 22." *Pettus v. Astrue*, 226 Fed. Appx. 946, 948 (11th Cir. Apr. 5, 2007) (not selected for publication in the Federal Reporter, No. 06-15667). However, it has been pointed out that: "Listing 12.05 does not require *significant* deficits in adaptive functioning; it only requires that there be 'deficits in adaptive functioning initially manifested during the developmental period; i.e., . . . before age 22.' 20 C.F.R., Part 404, Subpart P, Appendix 1 § 12.05." *Cammon v. Astrue*, 2009 U.S. Dist. LEXIS 92293, 2009 WL 3245458, *11 (N.D. Ga. Oct. 5, 2009) (No. CIV. A. 3:08-CV-0131-JFK).

*Id.* at 1355 n.5.  Further,

> The caselaw addressing the "adaptive functioning" aspect of Listing 12.05C suggests that the adaptive functioning must be significantly inconsistent with the I.Q. score.  An ability to do simple daily activities and simple jobs is not enough.  As noted in *Lowery*, in *Popp* the court sustained the ALJ's rejection of a claim of equivalency to Listing 12.05C because the claimant's I.Q. score of 69 was "inconsistent with evidence that [the claimant] had a two-year college associate's degree, was enrolled in a third year of college as a history major, and had worked in various technical jobs such as an administrative clerk, statistical clerk, and an algebra teacher."  979 F.2d at 837, citing *Popp*, 779 F.2d at 1499.  Additionally, there was evidence in *Popp* that the claimant had "tended to place himself in a very unfavorable light," thereby rendering the personality test scores (the MMPI, not the I.Q. test) invalid in the opinion of the examiner.  *Popp*, 779 F.2d at 1498-1499, 1500.
>
> *Popp* is perhaps the strongest case for finding that an I.Q. score below 70 does not necessarily meet Listing 12.05C.  There are several others with facts somewhat like *Popp*.  *Bischoff v. Astrue*, 2008 U.S. Dist. LEXIS 79534, 2008 WL 4541118 (S.D. Fla. Oct 9, 2008) (No. 07-60969-CIV), affirmed the determination that Listing 12.05C was not met.  The court noted that while the claimant's I.Q. scores were lower than 70, the claimant had previously worked as a parts manager and as an automobile mechanic, jobs which required technical knowledge and skills, and he successfully supervised other people for five years.  *Id.*, at *20.  There was also evidence that the claimant was "faking" his I.Q. score, and gave conflicting reports that he had finished only the sixth, or seventh, or eighth, or ninth, or tenth grades, or had a G.E.D., or had vocational training.  *Id.*

*Id.* at 1355.  As noted in <u>Monroe</u>, a different result was reached in

<u>Durham v. Apfel</u>, 34 F. Supp. 2d 1373 (N.D. Ga. 1998) and where the court held:

> Mr. Durham's work history does not support the ALJ's implication that he successfully worked for 40 years.  He had no earnings whatsoever in nine years between 1953 and 1991, and minimal earnings several other years (TR 101-102).  Mr. Durham has worked primarily as a heavy laborer (TR 46).  There is no evidence that these jobs are beyond the reach of a mildly retarded individual.  34 F.Supp.2d at 1380.  Distinguishing *Popp*, the court said:
>
> Unlike Mr. Popp, Mr. Durham's work experience does not include technical jobs, but jobs as a laborer.  He did not teach high school algebra, he worked as a tire repairer, laborer, kitchen helper and material handler (TR 46).  Mr. Durham did not go to college, he went to the fourth grade.  *Id. See also Markle v. Barnhart*, 324 F.3d 182, 187 (3d Cir. 2003) ("ability to pay his own bills, add and subtract, use an ATM machine and to take care of all his own personal needs," and "ability

to identify and administer his medication; his previous jobs; his obtaining a GED"
were not inconsistent with a finding of mental retardation and the I.Q. scores)
(citing *Brown v. Sec'y of HHS*, 948 F.2d 268, 270 (6th Cir. 1991), "rejecting the
Commissioner's argument that a claimant's full scale IQ of 68 was inconsistent
with, among other things, his driver's license and work history as a truck driver,
limited literacy and sixth grade education, and ability to make change, do
laundry, and clean his room.").

Monroe, 726 F. Supp. 2d at 1356-57; *see* Willis v. Astrue, No. 5:12cv/RS/CJK, 2012 WL

6725605 (N.D. Fla. Nov. 26, 2012).

### 2. The ALJ's findings

At step two, the ALJ determined that Plaintiff had one severe impairment--

borderline intellectual functioning. R. 22. At step three, the ALJ determined that

Plaintiff did not have an impairment or combination of impairments that meets or

medically equals one of the listed impairments in 20 C.F.R., Part 404, Subpart P,

Appendix 1, including Listing 12.05 (mental retardation). R. 23. In making this

determination, the ALJ considered the criteria of Listing 12.05A-D. R.23-26. Relevant

here, the ALJ expressly considered the criteria of Listing 12.05C (mental retardation).

The ALJ found that Plaintiff had documented IQ scores of between 60 and 70

when she scored identical scores in the 5th and 8th grades--Full-scale (FSIQ) score of

60, Verbal (VIQ) score of 63, and Performance (PIQ) score of 64. R. 23-24. The ALJ

initially cites to Exhibit 7F, pages 18 and 28, and then, after restating the score(s) on the

following page, cites to Exhibit 7F, page 18. R. 23-24. (Exhibit 7F are records from the

Gadsden School District from 1994 to 2004. R. 301. It appears that almost all of the

pages are cut-off, leaving off material on the left-hand side of the page. R. 302-28.)

Exhibit 7F, page 2, R. 302, refers to a testing date of September 20, 1994, when

Plaintiff was nine years old and in the third grade. Exhibit 7F, page 18, which is not

dated, provides test scores and notes that Plaintiff is in the fifth grade. Also noted are test scores (Johnson Psycho-Educational Battery-Revised) from February 25, 1997, when Plaintiff was 12 years old and in the fifth grade. R. 215, 318. IQ scores from May 19, 1992, are listed that include the IQ scores mentioned by the ALJ. R. 318. There are other, non-IQ scores from September 29, 1994. *Id.* Exhibit 7F, page 28, also undated is a "reevaluation report" indicating that Plaintiff is in the eighth grade and again notes the May 19, 1992, IQ scores, two sets of scores from 1991, and "test of educational achievement (K-TEA)" scores of October 6, 1999. R. 328. It appears Plaintiff has at least one valid set of IQ scores when she was examined on May 19, 1992, and when she was seven years old and in the first grade. (She repeated the first grade. R. 212-13.) On the other hand, the ALJ may have been reading from full-sized documents, unlike the documents in this record, which may have included two sets of IQ scores. Nevertheless, even though no party has raised an issue regarding Plaintiff's IQ scores, on remand, clarification is needed regarding when Plaintiff received IQ testing and the results.

The ALJ found, however, that Plaintiff

does not have other physical or mental impairments which impose an <u>additional and significant</u> work-related limitation of function. The overall evidence in this case clearly shows that the claimant has no other severe physical impairments (as discussed in finding 5 below [RFC findings]) and no significant deficits in adaptive functioning, based on her documented activities of daily living and adaptive social functioning, discussed in more detail below, including the satisfactory performance of 30 hours of weekly volunteer work.

R. 24.

Although not specifically at issue here, the ALJ also determined that Plaintiff did not meet the criteria of Listing 12.05D. The findings are relevant, however, because the

ALJ discusses Plaintiff's activities of daily living, social functioning, concentration,

persistence, or pace, and whether Plaintiff had any extended episodes of

decompensation.  R. 24-26.  (The ALJ made separate a separate RFC assessment.

R. 27-30.)  After discussing Plaintiff's IQ scores, the ALJ stated:

> The claimant was classified as "educable mentally handicapped," and she
> received exceptional student education services while attending school (Exhibit
> 7F).  A cumulative summary of the claimant's educational record reflected grades
> that were mostly average throughout her high school tenure, and she graduated
> with a cumulative GPA of 2.0961.  The claimant received a standard high school
> diploma with a Florida Comprehensive Assessment Test (FCAT) waiver, which is
> available to certain students with disabilities (Exhibit 11E/9).  In order to have
> received the standard high school diploma [in 2005, R. 219], the claimant met all
> the other requirements for graduation, with the exception of the passing score on
> the FCAT (Exhibit 7F/5).

R. 24.[3]  The ALJ then explained

> [a]ctivities of daily living include adaptive activities such as cleaning, shopping,
> cooking, taking public transportation, paying bills, maintaining a residence, caring
> appropriately for your grooming and hygiene, using telephones and directories,
> and using a post office.  Under the law and regulations, the quality of these
> activities is assessed with regard to their independence, appropriateness,
> effectiveness, and sustainability, with consideration of the extent to which the
> claimant is capable of initiating and participating in these activities independent of
> supervision or direction.

*Id.* (referring to but without citation to 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00C.1.).

The ALJ considered a May 2009 adult function report and Plaintiff's testimony at

the hearing reporting her activities of daily living and found that Plaintiff "has no

restriction in activities of daily living."[4]  R. 24-25.  The ALJ explained that Plaintiff

---

[3]  School records indicate Plaintiff repeated the first and twelfth grades.
R. 212-13, 218.

[4]  The ALJ noted that "[i]n a brief submitted prior to the hearing to the ALJ,
Plaintiff's representative "contended that the claimant has *mild* restriction in activities of
daily living, *mild* difficulties in maintaining social functioning, *moderate* difficulties in
maintaining concentration, persistence or pace and has experienced *no* episodes of
decompensation (Exhibit 13E/6)." R. 26 (emphasis added).

demonstrated her adaptive functioning abilities when she was the caretaker of an infant and a six-year old, which included helping her daughter get ready for school, playing with her daughter, and reading to her daughter.  R. 24-25, 43, 49, 181-83, 185.  The ALJ further explained that Plaintiff also cared for her personal needs without difficulty; prepared meals; shopped in stores, by mail, and on the computer for clothes, household goods, and personal items; had the ability to handle finances, including paying bill, counting change, handling a savings account, and using a check book/money orders; and performed household chores, including cleaning, laundering clothes, vacuuming, washing dishes, and ironing.  R. 24-25, 53, 182-84.  Plaintiff also enjoyed talking with others and going to her daughter's school to volunteer or attend school programs. R. 25, 185.  Plaintiff reported not needing anyone to accompany her when going out. R. 24-25, 185.  The ALJ also considered Plaintiff's daily activities, along with the medical evidence, when he assessed Plaintiff's RFC.  R. 29.  Additionally, no physician opined that Plaintiff had mental retardation or otherwise met the criteria of Listing 12.05C.  *See* R. 27-30.

The ALJ provided a definition of social functioning that tracts 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00C.2., discussed Plaintiff's social functioning, and determined that Plaintiff "has only mild difficulties in the area of social functioning."  R. 25.  The ALJ also provided a definition of concentration, persistence or pace that tracts 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00C.3., discussed the evidence relating to this subject, and determined that Plaintiff "has moderate difficulties in concentration, persistence or pace."  R. 26.

The ALJ also considered *some* of Plaintiff's work activities during his step two

analysis, when assessing Plaintiff's RFC, and when finding that Plaintiff was unable to

perform any past relevant work.  R. 25, 29-30.  A more detailed review of Plaintiff's early

years and work experience is required.

Plaintiff was born in 1984.  R. 144, 146.  In May 1992, when Plaintiff was seven

years old, Plaintiff's school administered the WISC-R to assess her intellectual capacity

and to evaluate her continued placement is special education programs for the

"educable mentally handicapped."  R. 223, 302, 318, 328.  This is the only readable IQ

score in the record.  Plaintiff repeated the first and twelfth grades.  R. 212-23, 218.

Nevertheless, Plaintiff received her high school diploma in 2005 with the caveat

mentioned above.  R. 24, 305.  Plaintiff has a restricted Florida driver's license--she

must have someone else in the car while she is driving.  R. 25, 43-44.

Prior to receiving her high school diploma in 2005, Plaintiff briefly worked at the

IGA Grocery Store in 2004 as a cashier and earned approximately $136.  She "always

asked" for help and received help with that job.  She got mixed-up when counting

money.  R. 48, 158.  Plaintiff worked at the "state mental hospital" as a "unit treatment

rehab specialist" from January 2005 to March 2007.  She worked part-time for three

days a week, eight hours per day.  R. 169.  She earned approximately $6,930 in 2005

from this job and approximately $250 from another job (Gadsden Tomato Company) in

the same year.  R. 158.  Plaintiff earned approximately $4,717 in 2006 and $5,557 in

2007 from her job at the state mental hospital.  R. 159-60.  She had temporary job(s) at

Staffco Management Group, Inc., in 2008 and received wages of approximately $72.  R.

159, 166, 228.

Plaintiff testified that she helped patients at the state mental hospital "feed themselves." R. 44. She was responsible for documenting the daily activities of, for example, five patients. Staff workers helped her with this job. R. 47. She "got fired over there because no one was helping" her so she went to a different unit, unit one. R. 44, 47. She was working in unit one where she passed out snacks, but did not receive any help. R. 44-45, 47. She was fired at the end of her shift. R. 45.

Plaintiff also worked and continues to work as a volunteer for 30 hours a week at a clothing store as a condition to obtain "cash assistance." R. 25, 29, 61-62. If she does not work, she does not receive any money. R. 61. The store is like a shoe or jewelry store. She does vacuum cleaning and places alarm monitors on the shoes. She also takes plastic off the shirts and puts them on a hanger and makes sure they are arranged correctly, medium to large. *Id.* The manager (the son of the owner) helps her and gives her "a lot of stuff to do. He'll tell [her she] can sit down or take a break when [she wants] to." She works ten or fifteen minutes and then rests. R. 62. (The ALJ noted that although Plaintiff was fired from her previous job, "she said she has a good relationship with her current supervisor [at the shoe or jewelry store] because he allows her to take frequent breaks, as she needs them." R. 25.) Plaintiff received unemployment compensation benefits for the first and second quarters of 2010. R. 30, 159.[5]

---

[5]  The vocational expert classified Plaintiff's prior work as "resident care assistant" with an SVP of 3 and a medium exertional level and also a "cashier retail industry" with an SVP of 3 and light exertional level. R. 64; *see* R. 30. The ALJ agreed with the vocational expert that Plaintiff could not perform these jobs. R. 30-31, 64. The ALJ found that Plaintiff could perform the jobs of "common area cleaner," "assembler, light products," and "clothing sorter, all with an SVP of 2 and light exertion based on the

The only work the ALJ described with some specificity was Plaintiff's work as a

30-hour a week volunteer.  R. 25, 29-30.  The ALJ stated:

> In order to maintain her monthly public assistance income payments, the claimant works 30 hours per week as an unpaid volunteer and she has testified that she additionally looks for other work nearly every day without success.  The claimant performs volunteer work in a retail clothing and jewelry store, with the primary duties of removing clothing from plastic packaging, hanging the clothing on hangers in order by size, and placing security tags on the merchandise.  Although the claimant has alleged taking frequent breaks and receiving some additional help from the store's manager, she reported that she is able to complete this unpaid, volunteer work satisfactorily in order to remain in compliance with the rules governing the receipt of her monthly cash assistance payments.

R. 29-30.  The ALJ also commented on Plaintiff's receipt of unemployment benefits:

> The record also reflects the claimant applied for and received State of Florida unemployment benefits during the period of the 1st and 2nd quarters of 2010 (Exhibit 3D).  Eligibility for State of Florida unemployment compensation insurance benefits is dependent upon certification by an applicant that they are able to work, available for work, and are actively seeking full-time employment during the claim period.  Based on said qualifying criteria, the claimant's actions in applying for and accepting State of Florida unemployment compensation insurance benefits could, under a "totality of the circumstances" analysis [sic], be considered inconsistent with the definition of "disability" under the Social Security Act.  Nevertheless, the receipt of unemployment benefits is only one of many factors that must be considered in determining whether the claimant is disabled 20 CFR 404.1512(b) and 416.212(b).

R. 30.

The ALJ mentioned Plaintiff's childhood IQ scores and the special education she

received in school.  R. 23-24.  He considered whether Plaintiff had deficits in adaptive

functioning, having considered her activities of daily living, social functioning, and

concentration, persistence or pace.  R. 24-25, 29-30.  The ALJ also considered

---

testimony of the vocational expert, premised on the assumption that Plaintiff could perform "a full range of light "work and further limited "to those jobs of one-step, two-step at most with the lowest possible SVP."  R. 32, 64-65.  The vocational expert opined that Plaintiff would not be able to work if Plaintiff needed "frequent supervision" as any such jobs would be "in a sheltered workshop type setting, which would decrease the number of positions substantially."  R. 65.

Plaintiff's physical issues following her slip and fall in November 2009. R. 25-29. The ALJ did not, however, thoroughly consider Plaintiff's work activity.

Here, Plaintiff has a valid IQ score of between 60 and 70 creating a rebuttable presumption of mental retardation under Listing 12.05C. Plaintiff completed the 12th grade, albeit with a FCAT waiver and after repeating two grades. She has a restricted driver's license such that she may only drive when accompanied by another. Plaintiff was 25 years old (defined as a younger individual, 18-49) as of November 8, 2009, the amended alleged onset date.

She has not received specialized training in any particular job skill. Plaintiff's jobs were performed on a part-time basis and no job paid her more than $6,930 yearly when she worked at the state mental hospital in 2005. The vocational expert classified her job there as a residential care, assistant, with an SVP of 3 and medium exertional level.

The ALJ considered Plaintiff's medical records when considering Plaintiff's RFC, R. 27-30, and some of the medical records as they pertained to his step two analysis, R. 25-26. Plaintiff was examined and treated by Jeffrey D. Wasserman, D.O., a treating physician at the Gadsden Medical Center from approximately June 2009 to April 2010. R. 25, 29, 356-66. The ALJ referred to Dr. Wasserman's patient note of April 12, 2010, when Plaintiff told him

> she cant physically do any work. Pt walked in here carrying her baby in a car-seat which certainly weight [sic] in excess of 25 pounds. She [sic] certainly appeared to have no difficulty in doing this. I feel that the pt can work, she seems to have an attitude that she does not want to work. She recently got very verbally abusive to one of our nurses using foul filthy language. I feel that wanda has a defiant attitude problem. At the very least she can do any type of activities sitting down.

R. 29, 361.  This appears to be Plaintiff's last visit with Dr. Wasserman.[6]  The ALJ noted

that "[w]hen the claimant was asked about this incident during the hearing, she said that

she simply got upset about the paperwork."  R. 25, 60-61.

The ALJ also noted that "Disability Determination Service medical and

psychological consultants were unable to substantiate the claimant's impairments due

to insufficient evidence of record. (Exhibit 2F; 5F; 6F)."  R. 29.  This finding is borne out

by the record.  For, example, on September 25, 2009, Shirley Ellis, Ph.D., completed a

Psychiatric Review Technique (PRT) and her medical disposition was: "insufficient

evidence."  R. 265 (Exhibit 2F).  Dr. Ellis's consultant's notes state, in part: "Attempts to

contact the clt and 3rd party contacts via tc and mail for additional information have

been unsuccessful.  Therefore, there is insufficient evidence to make a medical

determination on this claim."  R. 277.  On March 31, 2010, Richard K. Lyon, Ph.D.,

completed a PRT and reached the same conclusion as Dr. Ellis.  R. 286 (Exhibit 5F).

His consultant's notes state: "The clmt. is a 25 yro female with allegations of being slow.

This is a recon case, [sic] the clmt. failed to cooperate at the initial claim and she has

not returned her ADL or responded to any letters or calls.  There is insufficient MER or

ALDs in the file to render a valid medical decision other than insufficient evidence."

R. 298.  On April 1, 2010, James Patty, M.D., provided a "case analysis" and stated:

"The clmt. Is a 25 yro female with mental allegations only, however, at recon she states

on her 3341 that she does not hear well.  All attempts to contact the clmt. have been

---

[6]  The ALJ considered this and other patient notes from Dr. Wasserman, R. 25,
29, and "assigned significant weight" to his opinion "to the extent it is consistent with the
above-stated [RFC] assessment," and in light of his status as a licensed physician who
had a treating relationship with Plaintiff.  R. 29.

unsuccessful and there is not sufficient MER in the file to render a valid medical decision other than insufficient evidence." R. 300 (Exhibit 6F).

Agency worksheets reflect similar findings. *See, e.g.*, R. 68-71, 74-77, 84-89, 92-95. In particular, a September 25, 2009, "report of contact" is signed by a person from the Pensacola area, disability determinations' office, recounting conversations with Plaintiff and her mom regarding scheduled and re-scheduled consultant appointments. R. 189. One such call occurred on September 21, 2009, when it was noted that Plaintiff reported she did not go to her appointment on that date "because she did not feel like it" and Plaintiff was informed "that a decision would be made based on the information currently on file which is insufficient." *Id.*

Moreover, it does not appear that Plaintiff's representative, albeit a non-lawyer, sent Plaintiff to a consultative examination or requested the ALJ to do so. R. 40-67, 209-10, 231-37, 245-47. In fairness to Plaintiff's representative, she was not retained until on or about September 23, 2010. R. 107-09. Nevertheless, the hearing before the ALJ was held on May 11, 2011, and there appears to have been adequate time to refer Plaintiff or request that she be referred to a medical consultant for a physical and mental examination prior to the hearing. *See* 20 C.F.R. § 416.1540(b) (providing a claimant's representative must assist in developing the record). At the conclusion of the hearing, the ALJ stated that he would review the medical records and he would "make a decision [in the] next couple of weeks." R. 66. In response, Plaintiff's representative mentioned the amended alleged onset date and did not suggest the record was insufficient. *Id.* On March 22, 2012, and after the ALJ issued his decision, the representative provided the

Appeals Council with a brief, but did not express the need to re-open the record for receiving additional evidence or the need to refer Plaintiff to a medical consultant. R. 245-47.

The ALJ's summary of the medical evidence and Plaintiff's daily and social activities is complete. His analysis of the extent of Plaintiff's paid work was not. The ALJ overemphasized Plaintiff's ability to do simple daily activities, although his findings are supported by substantial evidence. Unfortunately, the record is lacking a medical source assessment of Plaintiff's mental condition as it may relate to her ability to work. Missed appointments with consulting examiners, through no apparent fault of the agency, have been noted herein.

This case falls between Popp and Monroe/Durham. The ALJ's RFC assessment, which admittedly requires considerations beyond the ALJ's step two analysis, *see* R. 26, is flawed because the ALJ did not adequately consider the nature, scope, and extent of Plaintiff's limited part-time work in conjunction with her valid childhood IQ scores and her daily adaptive functioning and daily activities. Rather, the ALJ focused on Plaintiff's volunteer work, which was rather limited in scope and involved some restrictions, including breaks when required. Plaintiff has not performed full-time, competitive work. On this record, it is uncertain whether this is attributable to Plaintiff's mental status or for other reasons.[7] Similarly, it cannot be determined whether Plaintiff's failure to meet with agency consultants was attributable to her mental status or otherwise. With these unanswered questions, a remand is in order because the record is incomplete.

_____

[7] The vocational expert opined that most employers would not make accommodations if frequent supervision were required and that "the type of jobs [she] had previously listed [common area cleaner, assembler, and clothing sorter] might be available but probably mostly in a sheltered workshop type setting, which would decrease the number of positions substantially." R. 65.

*See* <u>Graham v. Apfel</u>, 129 F.3d at 1422.

On remand, the ALJ should consider the record anew and open the record for additional evidence in order to make the required findings under the sequential evaluation process. No determination is made regarding whether Plaintiff is disabled and entitled to benefits.

## V. Conclusion

Considering the record as a whole, the ALJ's findings that Plaintiff is not disabled are not based upon substantial evidence in the record and the ALJ incorrectly applied the law in light of the inadequate record. Accordingly, pursuant to the fourth sentence in 42 U.S.C § 405(g), the decision of the Commissioner to deny Plaintiff's applications for Social Security benefits is **REVERSED** and this case is **REMANDED** for further proceedings consistent with this Memorandum Opinion and Order. The Clerk is **DIRECTED** to enter a final judgment for Plaintiff.

**IN CHAMBERS** at Tallahassee, Florida, on September 10, 2013.

<u>s/ Charles A. Stampelos</u>
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**